# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# MONROE DIVISION

| | |
|---|---|
| **TRACI YOLANDA HALL** | **CIV. ACTION NO. 3:20-1178** |
| **VERSUS** | **JUDGE TERRY A. DOUGHTY** |
| **KILOLO KIJAKAZI, ACTING COMMISSIONER, U.S. SOCIAL SECURITY ADMINISTRATION** | **MAG. JUDGE KAYLA D. MCCLUSKY** |

## REPORT AND RECOMMENDATION

Before the court is Plaintiff's petition for review of the Commissioner's denial of social security disability benefits.   The district court referred the matter to the undersigned United States Magistrate Judge for proposed findings of fact and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C).   For the reasons assigned below, it is recommended that the decision of the Commissioner be **REVERSED and REMANDED for further proceedings.**

## Background & Procedural History

Traci Hall protectively filed the instant application for Title XVI supplemental security payments[1] on March 31, 2018.   (Tr. 12, 165-177).   Hall, who was 48 years old at the time of the administrative hearing, asserted an amended disability onset date of March 31, 2018, because of vision problems, diabetes, peripheral neuropathy, anxiety disorder, high blood pressure, and stomach ulcers.   (Tr. 35, 66, 191).   The state agency denied the claim(s) initially on September 14, 2018.   (Tr. 66-94, 96-105).   Thereafter, Hall requested and received an August 30, 2019

---

[1] Hall also contemporaneously filed an application for Title II disability insurance benefits. However, she subsequently amended her disability onset date beyond the date that she was last insured for benefits, which rendered her ineligible for Title II benefits.   Consequently, at the hearing she voluntarily withdrew her request for Title II benefits, and the ALJ dismissed that claim.   *See* Tr. 12.

hearing before an Administrative Law Judge ("ALJ").   (Tr. 31-65).   In a November 1, 2019 written decision, the ALJ determined that Hall was not disabled under the Social Security Act, finding at step five of the sequential evaluation process that she was able to make an adjustment to work that exists in significant numbers in the national economy.   (Tr. 9-24).   Hall appealed the adverse decision to the Appeals Council.   On July 8, 2020, however, the Appeals Council denied Hall's request for review; thus, the ALJ's decision became the final decision of the Commissioner.   (Tr. 1-3).

On September 10, 2020, Hall filed the instant complaint for judicial review of the Commissioner's final decision.   Succinctly restated, Plaintiff contends that the ALJ's residual functional capacity assessment is not supported by substantial evidence.   Following submission of the administrative transcript and supporting memoranda, the matter is now before the court.

## **Standard of Review**

This court's standard of review is (1) whether the final decision is supported by substantial evidence, and (2) whether the Commissioner applied the proper legal standards to evaluate the evidence.   *Keel v. Saul*, 986 F.3d 551, 555 (5th Cir. 2021) (citation omitted).   The Supreme Court has emphasized that

> [t]he phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding.   Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations.   And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla."   It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Biestek v. Berryhill*, ___ U.S. ___, 139 S.Ct. 1148, 1154 (2019) (internal citations omitted).

2

The reviewing court may not reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner.   *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994).

Upon finding substantial evidence, the court may only review whether the Commissioner has applied proper legal standards and conducted the proceedings consistently with the statute and regulations.   *Carter v. Heckler*, 712 F.2d 137, 140 (5th Cir. 1983).   In other words, where the Commissioner's decision is supported by substantial evidence, the findings therein are conclusive and must be affirmed – *unless* the Commissioner applied an incorrect legal standard that materially influenced the decision.   *See* 42 U.S.C. § 405; *Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000); *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001).

### Determination of Disability

Pursuant to the Social Security Act ("SSA"), individuals who contribute to the program throughout their lives are entitled to payment of insurance benefits if they suffer from a physical or mental disability.   *See* 42 U.S.C. § 423(a)(1)(D).   The SSA defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . ."   42 U.S.C. § 423(d)(1)(A).   A disability may be based on the combined effect of multiple impairments which, if considered individually, would not be of the requisite severity under the SSA.   *See* 20 C.F.R. § 404.1520(a)(4)(ii).   Based on a claimant's age, education, and work experience, the SSA utilizes a broad definition of substantial gainful employment that is not restricted by a claimant's previous form of work or the availability of other acceptable forms of work.   *See* 42 U.S.C. § 423(d)(2)(A).

The Commissioner of the Social Security Administration has established a five-step sequential evaluation process that the agency uses to determine whether a claimant is disabled under the SSA.   *See* 20 C.F.R. § 404.1520, 416.920.   The steps are as follows,

(1)     An individual who is performing substantial gainful activity will not be found disabled regardless of medical findings.

(2)     An individual will be found not disabled if he or she does not have a "severe impairment," or a combination of impairments that is severe, and of the requisite duration.

(3)     An individual whose impairment(s) meets or equals a listed impairment in [20 C.F.R. pt. 404, subpt. P, app. 1], and meets the duration requirement, will be considered disabled without the consideration of vocational factors.

Before proceeding to step four, the Commissioner assesses the individual's residual functional capacity, which is used at both step four and step five to evaluate the claim.

(4)     If an individual's residual functional capacity is such that he or she can still perform past relevant work, then a finding of "not disabled" will be made.

(5)     If an individual is unable to perform past relevant work, then other factors including age, education, past work experience, and residual functional capacity must be considered to determine whether the individual can make an adjustment to other work in the economy.   If the individual can make such an adjustment, then he or she will be found not disabled.   If the individual is unable to adjust to other work, then he or she will be found disabled.

*See Boyd v. Apfel*, 239 F.3d 698, 704 -705 (5th Cir. 2001); 20 C.F.R. '§ 404.1520, 416.920.

When a finding of "disabled" or "not disabled" may be made at any step, a decision will be rendered at that point without proceeding to the remaining steps.   20 C.F.R. § 404.1520, 416.920; *Villa v. Sullivan*, 895 F.2d 1019, 1022 (5th Cir. 1990).   "The claimant bears the burden of proof on the first four steps, but the Commissioner bears the burden on the fifth

step." *Salmond v. Berryhill*, 892 F.3d 812, 817 (5th Cir. 2018) (citation omitted).

## The ALJ's Findings

### I.      Steps One, Two, and Three

The ALJ determined at step one of the sequential evaluation process that the claimant did not engage in substantial gainful activity during the relevant period.   (Tr. 15).   At step two, he found that the claimant suffered severe impairments of diabetes mellitus II, hypertension, retinopathy with macular edema, peripheral neuropathy, obesity, and depressive disorder.   *Id*. He concluded, however, that the impairments were not severe enough to meet or medically equal any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4, at step three of the process.   (Tr. 15-18).

### II.      Residual Functional Capacity

The ALJ next determined that the claimant retained the residual functional capacity ("RFC") to perform light work,[2]  except that she was limited to occasional near acuity and could understand, remember, and carryout simple instructions and tasks for two-hour blocks of time.

---

[2]   Light work entails:

> . . . lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. §§ 404.1567(b), 416.967(b).

(Tr. 18-22).

### III.   Steps Four and Five

With the assistance of a vocational expert ("VE"), the ALJ determined at step four of the sequential evaluation process that the claimant was unable to perform her past relevant work. (Tr. 22).   Accordingly, he proceeded to step five.   At this step, the ALJ determined that the claimant was a younger individual, with at least a high school education, and the ability to communicate in English.   (Tr. 22-23).   Transferability of skills was not material to the decision. *Id*.

The ALJ next observed that given the claimant's vocational factors, and if she had an RFC that did not include any non-exertional limitations, then the Medical-Vocational Guidelines would direct a finding of not disabled.   20 C.F.R. §§ 404.1569, 416.969; Rule 202.21, Table 2, Appendix 2, Subpart P, Regulations No. 4; Tr. 23-24.   However, because the claimant's RFC *did* include non-exertional limitations, the ALJ consulted a vocational expert ("VE") to determine whether, and to what extent the additional limitations eroded the occupational base for work.   *Id*.   In response, the VE identified the representative jobs of **Storage Rental Clerk**, *Dictionary of Occupational Titles* ("DOT") Code # 295.367-026; and **Silver Wrapper**, DOT # 318-687-018, that were consistent with the ALJ's RFC and the claimant's vocational profile. (Tr. 23, 63-64).[3]

---

[3] The VE responded that for the storage rental clerk and silver wrapper jobs there were 42,800 and 107,600 positions available nationwide, respectively.   (Tr. 23, 63-64).   This incidence of work constitutes a significant number (and range) of jobs in the "national economy."   42 U.S.C. § 423(d)(2)(A); *Johnson v. Chater*, 108 F.3d 178, 181 (8th Cir. 1997) (200 jobs at state level and 10,000 nationally, constitute a significant number).

**Non-Exhaustive Chronology of Relevant Medical Evidence**

On October 5, 2017, Geaux Family Health referred Hall to a podiatrist for her right foot ulcer/diabetic neuropathy.   (Tr. 360).   Pursuant to the referral, Hall saw Luke Hunter, DPM, as a new patient on October 13, 2017, for a diabetic ulcer between her right fourth and fifth toes. (Tr. 270-274).   Hall reported that she had been receiving treatment on the wound for two weeks. *Id*.

On November 6, 2017, Hall returned to Dr. Hunter for wound debridement for the area between her fourth and fifth toes.   (Tr. 266-270).   Dr. Hunter advised Hall to check her feet daily because of increased loss of proprioceptive nerves, which affected her balance and the protective sensation nerves.   *Id*.   He further advised her to *continue using her walker* to aid in getting around to avoid falls.   *Id.*

Hall went to the East Carroll Parish Hospital on December 30, 2017, for abdominal pain. (Tr. 537-544).   She was diagnosed with biliary colic.   *Id.*   Hall returned to the East Carroll Parish Hospital on January 1, 2018, for complaints of vomiting.   (Tr. 521-524).   She was diagnosed with nausea.   *Id.*

On February 9, 2018, Hall went to East Carroll Parish Hospital with complaints of constipation.   (Tr. 583-589).   She returned to East Carroll Parish Hospital on February 11, 2018 with complaints of difficulty urinating.   (Tr. 560-567).   She was diagnosed with a urinary tract infection.   *Id.*   On February 12, 2018, Hall went to West Carroll Hospital emergency room with complaints of nausea, vomiting, etc.   (Tr. 436).

On February 15, 2018, Geaux Family Health told Hall that she could not continue to frequent the emergency room for the same issue.   (Tr. 776).   Everything was within normal limits.   *Id.*   Nevertheless, Hall returned to the emergency room on February 17, 2018, with

complaints of persistent nausea and vomiting.   (Tr. 446).   A February 17, 2018 x-ray of the abdomen was normal.   (Tr. 459).

On February 23, 2018, Hall underwent a esophagogastroduodenoscopy that resulted in impressions of nausea, vomiting, hiatal hernia, GERD, gastric ulcer, and diabetic gastroparesis secondary to type II diabetes.   (Tr. 761-762).[4]

Hall was hospitalized at Glenwood Regional Medical Center from March 29-30, 2018, with acute pancreatitis.   (Tr. 245-254).   It was noted that she had longstanding diabetes mellitus type 2, with complications of gastroparesis, plus chronic nausea, vomiting, and abdominal pain. *Id.*   Upon discharge, Hall was ambulating without difficulty, and her pain had returned to baseline.   *Id.*

Hall returned to Dr. Hunter on March 9, 2018, to discuss her Gabapentin use.   (Tr. 263-266).   She explained that she had not been taking her Gabapentin for three months, but when she did take it, it helped her a good bit.   *Id.*   Her pain was not completely gone, but was better than when it started.   *Id.*   She also had a wound on the bottom of her left big toe.   *Id.*   Hall was not in pain at the moment, but when she was, it was a sharp shooting pain that was a ten on a ten-point scale.   *Id.*   Hunter prescribed a diabetic shoe to prevent pedal ulceration.   *Id.*

On March 22, 2018, Hall was seen by Raj Bhandari, M.D., for follow-up at Gastroenterology & Nutritional Medical Services.   (Tr. 419-420).   Hall had severe constipation and a tubuloadenoma.   *Id.*   There was no nausea, vomiting, fever, chills, or sweats.   *Id.*   She vomited occasionally, but had no other complaints.   *Id.*

---

[4] Gastroparesis is when it takes longer than usual for food to move from the stomach to the intestines.   (Tr. 672).   It happens when nerves that control the stomach muscles are damaged. *Id.*   The nerve damage could be caused by diabetes, surgery to the stomach or intestines, etc. *Id.*   Treatment is unlikely to cure it.   *Id.*

A March 27, 2018 CT scan of the abdomen showed mild pancreatitis.   (Tr. 484).

On April 13, 2018, Hall returned to Dr. Hunter for follow-up care to discuss diabetic shoes and to review her Gabapentin dose.   (Tr. 259-262).   Hall was taking 400 mg Gabapentin, three times per day, but had not noticed any improvement in her symptoms.   *Id.*   She had numbness, tingling, burning, and shooting pains in both feet equally.   *Id.*   She reported that she was unable to feel the pulse in her left foot, which had been going on for about one year.   *Id.* She reported muscle aches, muscle weakness, arthralgias, but no nausea, vomiting, fever, or vision change.   *Id.*   She had a non-antalgic gait, with no edema.   *Id.*   She had no paresthesia, anesthesia, or hyperesthesia.   *Id*.   Her gross sensation was intact bilaterally.   *Id.*   She had normal strength and tone, with normal range of motion.   *Id.*   Dr. Hunter discussed Hall's diabetic neuropathy symptoms and her bilateral foot pain.   *Id.*   He explained that she had good pulses in her feet.   *Id.*

Hall returned to Dr. Bhandari on May 3, 2018.   (Tr. 333-334).   Upon examination, sensation was within normal limits.   *Id.*   Dr. Bhandari diagnosed elevation of liver function tests; acute interstitial pancreatitis, hypertension, type II diabetes with diabetic gastroparesis, gastroesophageal reflux disease, and obesity.   *Id.*   He recommended a low-glycemic index diet. *Id.*

On June 7, 2018, L. P. Neumann, Jr., M.D., recommended an ADA bland diet for Hall. (Tr. 901).

Hall went to the East Carroll Parish Hospital on June 10, 2018, with complaints of acute abdominal pain.   (Tr. 603-611).   She was discharged that day with a diagnosis of viral gastroenteritis.   *Id.*   She was prescribed Phenergan, as needed, for nausea and/or vomiting.   *Id.*

On June 11, 2018, Hall went back to East Carroll Parish Hospital with complaints of

vomiting.   (Tr. 629-631).   She was prescribed Zofran and discharged.   *Id.*

Hall again returned to East Carroll Parish Hospital on June 12, 2018, with complaints of abdominal pain and nausea.   (Tr. 694-697).   She was diagnosed with intractable vomiting and dehydration and admitted overnight.   *Id.*

On June 17, 2018, Hall returned to East Carroll Parish Hospital with complaints of vomiting.   (Tr. 648-656).   She was diagnosed with gastroparesis and discharged.   *Id.*

Hall attended an appointment with Dr. Hunter on July 3, 2018, for diabetic shoe dispensing.   (Tr. 846-850).   She stated that her new shoes felt great, and that she had no pain in her feet.   (Tr. 853, 857).   Hall added that the Gabapentin was helping her and had decreased the shocking pains in her feet to once per week or only at night instead of all day, every day.   *Id.* Hunter diagnosed diabetic neuropathy and foot pain.   (Tr. 858).

At a July 27, 2018, office visit, Dr. Neumann diagnosed Hall with anxiety, gastroparesis, and diabetes mellitus.   (Tr. 897).   He referred Hall to mental health.   *Id.*

On July 31, 2018, non-examining agency physician Nancy Martin Cook, M.D., reviewed the record and completed a physical RFC assessment indicating that Hall was capable of medium work.   (Tr. 75-76).   However, for the period prior to June 30, 2015, Dr. Cook opined there was insufficient evidence.   (Tr. 90).   Hall also had no medically determinable mental impairment for the period prior to June 30, 2015, according to non-examining agency physician, Robert Clanton, Ph.D.   (Tr. 90-91).

Hall saw Ruben Grigorian, M.D., on August 10, 2018, for an eye exam.   (Tr. 748).   She had 20/40 vision in each eye and bilateral hypertensive retinopathy.   *Id.*   She also had type 2 diabetes mellitus with mild non-proliferative diabetic retinopathy and macular edema, bilaterally. *Id.*   Hall was to follow-up in one year.   *Id.*

10

At the request of the state agency, Hall underwent a consultative mental status examination on August 30, 2018, with Candi Hill, Ph.D.  (Tr. 499-502).  During the interview, Hall explained that she became depressed around 2013.  *Id.*  However, she never participated in counseling and never had been diagnosed with a mental health disorder.  *Id.*  Hall reported that she could no longer concentrate to watch television or read.  *Id.*  She estimated that she smoked one and one-half packs of cigarettes per day.  *Id.*  She also admitted past marijuana use.  *Id.* She had lost fifteen pounds in the last fifteen months because of gastroparesis.  *Id.*  She had attempted suicide with insulin four years ago, but denied any current suicidal ideation or intent. *Id.*  Hall reported auditory hallucinations that began when she was 45 years old and occurred only with depression.  *Id.*

Hill noted that Hall's conversational ability was adequate, and that she was able to follow and understand complex directions.  *Id.*  Overall, her memory appeared marginally intact.  *Id.* Immediate, recent, and remote memory were adequate.  *Id.*  Delayed memory, however, was impaired.  *Id.*  Her overall sustained concentration was marginal.  *Id.*  Her ability to stay on task was adequate, but some repetition was needed with simple and complex questions.  *Id.* Overall immediate concentration was marginal.  *Id.*  Her mental computation abilities and persistence were adequate.  *Id.*  Her social interaction was adequate.  *Id.*  Her overall adaptation was fair because of emotional and physical limits.  *Id.*

Hall was able to wash dishes, but could not sweep or mop.  *Id.*  She reported that she needed frequent breaks.  *Id.*  She was able to manage money independently.  *Id.*  She was able to prepare simple meals for herself and others, but purportedly forgot that she was cooking at times. *Id.*

In sum, Hall's understanding was intact; her immediate concentration was adequate; her

delayed memory was minimal; her immediate concentration was minimal; her sustained concentration was adequate; persistence was good; social interaction was adequate; adaptation was adequate.  *Id.*  Her prognosis was fair.  *Id.*  Hill diagnosed major depressive disorder and recommended counseling.  *Id.*  She opined that Hall would have no difficulty repeating, comprehending and following moderately complex instructions, work routines, and procedures. *Id.*  She also was able to follow complex instructions and understand complex questions.  *Id.* Hall could recall simple instructions, locations, and work-like procedures.  *Id.*  However, she would require re-training or frequent monitoring.  *Id.*  She also could not follow simple instructions without redirection.  *Id.*  Sustained concentration was adequate; she could work for adequate periods of time without supervision.  *Id.*  Her persistence was good.  *Id.*

On September 11, 2018, non-examining agency psychologist, Robert Clanton, Ph.D., reviewed the record, including Dr. Hill's mental status examination, and completed a mental RFC wherein he indicated, *inter alia*, that Hall was not significantly limited in her ability to remember locations and work-like procedures and her ability to understand and remember very short and simple instructions.  (Tr. 76-77).  However, she was moderately limited in her ability to understand and remember detailed instructions such that she was capable of understanding and remembering simple, 1-2 step instructions, but would have difficulty understanding and remembering more complex, multi-step instructions.  *Id.*  Hall also was not significantly limited in her ability to carry out very short and simple instructions but was moderately limited in her ability to carry out detailed instructions and in her ability to maintain attention and concentration for extended periods.  *Id.*  She was not significantly limited in her ability to work with others without being distracted by them or in her ability to make simple work-related decisions.  *Id.*

On October 3, 2018, Hall returned to Dr. Hunter for follow-up for foot pain.  (Tr. 841-

846).   She rated her pain as an 8/10 that sometimes went to 10/10.   *Id.*   She related that when she takes her shoes off, it feels like they are still on.   *Id.*   She could not feel the temperature of her bath water with her feet.   *Id.*

Hall returned to Dr. Neumann on October 5, 2018.   (Tr. 893).   He encouraged her to speak with a counselor at mental health.   *Id.*   He assessed gastroparesis and foot pain.   *Id.*

On October 31, 2018, Hall saw Dr. Hunter for follow-up for tibialis posterior tendinitis and diabetic neuropathy.   (Tr. 838-842).   Hall had pain in both feet, equally.   *Id.*   Her left foot hurt in her arch and the right foot hurt in her toes.   *Id.*   She rated her pain as a 9/10 and described it as a sharp, burning electrical sensation.   *Id.*   She had been wearing the braces that Dr. Hunter had prescribed for her for about one month and they helped a lot.   *Id.*   She rated her pain while in the braces as a 6/10, but noticed improvement.   *Id.*   Hall was unable to attend physical therapy because she did not have transportation.   *Id.*   She reported weakness, numbness, or tingling in her toes and burning.   *Id.*   Hunter listed her issues as pain in the right and left feet, tibialis posterior tendinitis, diabetic neuropathy, long-term current use of drug therapy, rheumatoid arthritis, folic acid deficiency, anemia, and vitamin D deficiency.   *Id.*

On November 7, 2018, Hall returned to her primary care physician, Dr. Neumann, who referred her to rheumatology for possible rheumatoid arthritis.   (Tr. 892).

Hall saw Dr. Hunter on January 8, 2019, for follow-up for her bilateral foot pain and tibialis posterior tendinitis.   (Tr. 960-965).   She reported that her feet hurt equally, and that there were no new changes.   *Id.*   Hall rated her pain as a 6/10 and described it as a numbing and burning sensation.   *Id.*   Her pain was on the outside of her ankles.   *Id.*   Hall had been in her PTTD braces on both feet for a long time.   *Id.*   She had an appointment scheduled in February with a rheumatologist.   *Id.*   X-rays of the feet appeared to be unremarkable.   *Id.*

On April 8, 2019, Hall returned to Dr. Hunter for follow-up for pain in her bilateral feet and diabetic neuropathy.   (Tr. 955-960).   Hall reported bilateral foot pain that she described as sharp and crampy and rated as an 8/10.   *Id.*   She did not take anything for the pain.   *Id.*   Hall reported muscle aches, muscle weakness, arthralgias, and joint pain.   *Id.*   The podiatrist opined that Hall would benefit from external support offered by braces.   *Id.*   The braces would decrease her pain, increase stability and mobility, and support the malfunctioning body part.   *Id.*

On May 9, 2019, Jay Zaffater, C.Ped., recommended an articulated ankle foot orthosis to stabilize Hall's ankles.   (Tr. 951).

On May 29, 2019, Hall returned to the podiatrist for pain in her bilateral feet, which she rated as an 8/10.   (Tr. 944-948).   *Id.*   Hall took Tylenol for her pain.   *Id.*   Hall's physical exam was relatively unchanged from her previous exams.   *Id.*   Dr. Hunter referred Hall to physical therapy.   *Id.*   An MRI showed that she had an inflamed ligament.   *Id.*

On June 11, 2019, Hall saw physical therapist Anjelique Liles for her foot pain.   (Tr. 930-933).   Hall reported that she had little to no sensation in both feet, but experienced sharp pain from her legs and feet.   *Id.*   Hall added that she could not drive because she could not feel her feet.   *Id.*   She experienced burning and sharp pain from both legs that medication rarely helped.   *Id.*   Hall's pain was exacerbated by standing and walking.   *Id.*   Upon examination, Hall had no sensation to the bottom of her feet.   *Id.*   She did not respond to light or deep touch/pressure.   *Id.*   She indicated that she had extreme difficulty walking two blocks and/or sitting for one hour.   *Id.*   Liles observed that Hall had difficulty walking long distances and difficulty standing for periods of time.   *Id.*   Liles was extremely concerned about Hall's lack of sensation in her bilateral feet and opined that she was a fall risk and risk for injury to her feet. *Id.*   Her disability index was 84%.   *Id.*

On June 17, 2019, Hall stated that she could not tell any improvement after her first treatment.  (Tr. 935).   Rather, she reported increased foot pain.  *Id.*

Hall returned to the podiatrist on June 19, 2019, for brace dispensing with Jay Zaffater. (Tr. 941-943).   Hall was fitted with bilateral foot braces, which were medically necessary.  *Id.*

On July 12, 2019, Hall underwent an EMG/nerve conduction study, which showed sensory-motor peripheral neuropathy with mixed axonal and demyelinating features, possibly caused by poorly controlled diabetes resulting in distal neuropathy.  (Tr. 936-939). Furthermore, because of involvement of proximal tibial motor nerves, other etiology possibly was coexistent.  *Id.*   Close clinical follow-up was needed.  *Id.*

On July 16, 2019, Hall was discharged from physical therapy.  (Tr. 974-975).   Hall was very discouraged and understandably depressed.  *Id.*   She was concerned because she had been denied disability initially and an appeal hearing was set for August.  *Id.*   The physical therapist opined that Hall should be wearing bilateral AFOs to prevent incidental sprains and *using an assistive device at all times* to decrease injury risk.  *Id.*   Hall should not spend too much time standing before sitting and decreasing weight bearing stresses on lower extremities.  *Id.*   Hall must perform visual inspections of the bilateral feet multiple times per day to ensure that she had not accidentally stepped on anything that could puncture her skin.  *Id.*   It was not safe for her to drive a vehicle.  *Id.*

Also on July 16, 2019, PT Liles wrote a To Whom it May Concern note wherein she remarked that Hall had received four treatments over a couple of weeks.  (Tr. 978).   Liles stated that Hall suffered from severe decreased sensory input in bilateral lower extremities which resulted in her being unable to feel any testing or treatment being performed.  *Id.*   Liles was concerned because this was such a severe case.  *Id.*   She opined that Hall was at great risk for

falls and personal injury because she could not feel when her feet were in contact with the floor, much less whether the floor was level and safe. *Id.* Hall should be wearing bilateral AFOs to prevent incidental sprains and using an assistive device at all times to decrease injury risk. *Id.* She should not spend too much time standing before sitting and decreasing weight bearing stresses on her lower extremities. *Id.* She must perform visual inspections of her bilateral feet multiple times per day. *Id.* Because of the severity of her loss of sensation, Liles did not feel that Hall would be able to attain gainful employment. *Id.*

## Analysis

### I.     RFC

In his decision, the ALJ reviewed the available evidence, including the hearing testimony, the claimant's activities of daily living, treatment records, the impressions of the consultative psychologist, and the assessments of the non-examining agency physician and psychologist. (Tr. 14-19). In deriving plaintiff's RFC, the ALJ specifically addressed the medical opinion evidence. First, the ALJ determined that the opinion of the consultative psychologist Candi Hill was not persuasive because she purportedly found that the claimant was able to understand complex instructions, but then unable to follow simple instructions, which was unsupported by a mental status examination. (Tr. 21-22). The ALJ further explained that Hill's opinion was not consistent with the claimant's "continued treatment and ability to perform activities of daily living." *Id*.

In lieu of Dr. Hill's opinion, the ALJ credited the findings of the state agency psychological consultant, Robert Clanton, Ph.D. (Tr. 22). The ALJ reasoned that Clanton's opinion was consistent with Hall's treatment and medication records, and the longitudinal evidence. *Id*.

16

The ALJ also found unpersuasive the purported findings of the state agency medical and psychological consultants that there was insufficient evidence to assess the claimant's activities. (Tr. 22).   Upon closer inspection, however, the medical consultant, Dr. Cook, opined that there was insufficient evidence only for the period prior to June 30, 2015, i.e., the date that Hall was last insured for disability insurance benefits.   (Tr. 90).   Of course, Hall later amended her disability onset date beyond the date she was last insured, and therefore, effectively withdrew her claim for disability insurance benefits thereby mooting the issue of whether she was disabled prior to June 30, 2015.   Moreover, the state agency psychological consultant, Robert Clanton, Ph.D., did not opine that there was insufficient evidence to assess the effects of Hall's mental impairments for the period prior to June 30, 2015.   Rather, he simply found that there was no evidence that Hall suffered from any mental medically determinable impairment at all prior to June 30, 2015.   (Tr. 91).

Finally, the ALJ found that Dr. Cook's opinion that Hall was capable of work at the medium exertional level was unpersuasive.   (Tr. 22).   The ALJ explained that Dr. Cook's finding was "not supported by a review of the claimant's records including positive findings of numbness and tingling."   *Id*.   The ALJ added that the opinion was not supported by a review of Hall's records and was inconsistent with the longitudinal evidence, including Hall's continued treatment history.   *Id*.   Instead of work at the medium exertional level, the ALJ decided that Hall would be capable of work at the light exertional level.

The court observes that "the ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion."   *Martinez v. Chater*, 64 F.3d 172, 175-76 (5th Cir.1995) (citation omitted).   However, an ALJ cannot reject a medical opinion without an explanation supported by good cause.   *See Loza v. Apfel*, 219 F.3d 378, 395 (5th Cir.2000)

17

(citations omitted).   Also, for claims filed on or after March 27, 2017, the Commissioner no longer affords "controlling weight" to the opinions of treating physicians and will not defer or give any specific evidentiary weight to any medical opinion(s) from the claimant's medical sources.   20 C.F.R. §§ 404.1520c(a) and 416.920c(a).   Furthermore, the fact that a medical source actually examined the claimant or specializes in an area germane to the claimant's medical issues are not primary or dispositive considerations in assessing the medical opinion. *See* 20 C.F.R. §§ 404.1520c(c) and 416.920c(c).   Rather, when determining the persuasiveness of a medical opinion, the most important factors are supportability and consistency.   20 C.F.R. §§ 404.1520c(b)(2) and 416.920c(b)(2).   Only when two or more medical opinions about the same issue are both equally well-supported and consistent with the record, but "not exactly the same," then the Commissioner will articulate how she considered the "other most persuasive factors," such as the medical source's relationship with the claimant (including the length of the treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and the examining relationship); the medical source's specialization; and other factors (including a medical source's familiarity with other evidence of the claim or an understanding of the agency's disability program's policies and evidentiary requirements).   20 C.F.R. §§ 404.1520c(b)(3)-(c) and 416.920c(b)(3)-(c).

Plaintiff argues that the ALJ's physical RFC is not supported by substantial evidence because the ALJ rejected Dr. Cook's impression, which represented the only medical assessment of the effects of Hall's physical impairments, and instead, impermissibly determined on his own that Hall was capable of work at the light exertional level.   It is manifest that once the claim reaches the ALJ hearing level, it is the ALJ's responsibility for assessing the claimant's RFC. 20 C.F.R. § 416.946(c).   Moreover, in his RFC assessment, the ALJ must consider a range of

18

evidence, not just statements from medical sources.   20 C.F.R. § 416.945(a)(3).   Therefore, the

absence of a supporting medical source statement regarding the effects and limitations of the

claimant's impairments does not undermine the ALJ's RFC, so long as there is other substantial

evidence to support the determination.   Here, however, the record is not so disposed.

In her brief to the court, the Commissioner argued that because Hall testified at the

hearing that she could lift a one-gallon milk jug weighing approximately eight pounds, this

supports a presumption that Hall could lift and carry items weighing up to 20 pounds, as required

for light work.   (Comm'r Brief, pg. 6).   However, it does not reasonably follow that Hall's

acknowledgement that she could *occasionally* lift up to eight pounds equates to the ability to

*frequently* lift up to ten pounds, let alone the ability to lift more than double that amount as

required for light work.

The Commissioner next argues that the ALJ implicitly adopted the state agency medical

consultant (Dr. Cook)'s assessment that Hall could stand and/or walk for about a total of six

hours in an eight-hour workday because work at both the medium and light exertional levels

contemplates the ability to stand and/or walk for a total of about six hours in an eight-hour day.

*See* TITLES II AND XVI:   DETERMINING CAPABILITY TO DO OTHER WORK--THE MEDICAL-

VOCATIONAL RULES OF APPENDIX 2, SSR 83-10 (S.S.A. Jan. 1, 1983), 1983 WL 31251.

The court perceives at least two errors with this reasoning.   First, the ALJ purported to

discount Dr. Cook's assessment for medium work on the basis that Hall's records included

"positive findings of numbness and tingling."   (Tr. 22).   These symptoms, however, do not

appear calculated to affect the amount of weight one can lift and carry.   Rather, in the lower

extremity context, they suggest additional limitation pertaining to the ability to stand and/or

19

walk.   Nonetheless, the ALJ did not make any reduction on Hall's ability to stand and/or walk attributable to these symptoms.

Second, even if the ALJ implicitly did adopt Dr. Cook's impression that Hall could stand and/or walk for six hours in an eight-hour workday, the record indicates subsequent progression/deterioration of Hall's peripheral neuropathy.   Dr. Cook issued her opinion on July 31, 2018, based on the record evidence at that time, which included medical records documenting Hall's bouts with gastroparesis and her podiatrist's notes through April 13, 2018.

It is manifest, however, that the severity of Hall's peripheral neuropathy did not remain static.   By October 2018, Hall was experiencing significant loss of sensation in her feet.   *See* Tr. 841-846.   By April 2019, the podiatrist had recommended that Hall receive braces to support her ankles.   (Tr. 951-960).   Furthermore, in June-July 2019, the physical therapist Anjelique Liles confirmed that Hall had no sensation to the bottom of her feet, and opined that she was at great risk for falls because she could not feel when her feet were in contact with the floor.   (Tr. 930-933, 978).   Liles opined that Hall should not spend too much time standing before sitting, and she must perform visual inspections of her bilateral feet multiple times per day.   *Id*.   Liles also stated that Hall required an assistive device at all times.   *Id*.   Moreover, a July 2019 EMG/nerve conduction study showing sensory-motor peripheral neuropathy provided independent, objective corroboration for Liles' assessment.   (Tr. 936-939).

It is manifest that the limitations recognized by Liles are inconsistent with the ALJ's determination that Hall was able to stand and/or walk for six hours in an eight-hour workday, without accommodation.   However, as best as the court can tell, the ALJ did not address Liles' opinion and did not mention the EMG/nerve conduction study.   That omission in and of itself

could suffice to undermine confidence in the decision, sufficient to compel reversal and remand. Furthermore, given the medical evidence showing the progression/deterioration of Hall's condition during the period at issue, the court is not persuaded that Dr. Cook's assessment issued in July 2018 may be used to provide support for the ability to work at the light exertional level.

Thus, in the end, it is apparent that the ALJ autonomously derived plaintiff's physical RFC, without the benefit of a supportive medical opinion.   In *Ripley v. Chater*, as here, the Commissioner argued that the medical evidence substantially supported the ALJ's decision. *Ripley v. Chater*, 67 F.3d 552, 557-558 (5th Cir. 1995).   The Commissioner in *Ripley* pointed to medical reports discussing the extent of plaintiff=s injuries, including a four-year history of back troubles.   *Id*.   However, without reports from qualified medical experts, the Fifth Circuit was unable to conclude that the evidence substantially supported the ALJ's residual functional capacity assessment because the court could not determine the "effects of [plaintiff's] conditions, no matter how 'small.'" *Id*.   The only evidence that described plaintiff's ability to work was plaintiff=s own testimony, which, when read in proper context, failed to support the ALJ's residual functional capacity assessment.   *Id*.[5]

The instant case is materially indistinguishable from *Ripley, supra*.   The record is devoid

---

[5]   The Commissioner argues that the absence of a corroborating medical source statement is not fatal to the ALJ's decision.   *Taylor v. Astrue*, 706 F.3d 600 (5th Cir.2012); *Joseph-Jack v. Barnhart*, 80 Fed. Appx. 317 (5th Cir. 2003).   The court agrees.   In *Taylor*, however, the ALJ relied on evidence from a treating physician and a medical consultant who testified at the hearing.   *See Taylor v. Astrue*, Civ. Action No. 10-1158, 2011 WL 4091506, at *4 (N.D. Tex. June 27, 2011). Furthermore, *in Joseph-Jack*, the claimant was seen by a consultative physician, who found no disability from an orthopedic standpoint.   *See Joseph-Jack v. Barnhart*, No. 02-0088 (W.D. La. Feb. 12, 2002) (R&R).   Needless to say, the medical source foundation for the ALJs' decisions in *Taylor* and *Joseph-Jack* is noticeably absent here.

of a cognizable medical source statement that supports the ALJ's physical RFC.   Moreover,

Hall's own testimony was not consistent with the ALJ's RFC.   (Tr. 49-50, 54-58).   Under these

circumstances, the court is compelled to find that the ALJ's assessment is not supported by

substantial evidence.   *See Williams v. Astrue*, 2009 WL 4716027 (5th Cir. Dec. 10, 2009)

(unpubl.) ("an ALJ may not rely on his own unsupported opinion as to the limitations presented

by the applicant's medical conditions"); *Ripley, supra* (substantial evidence lacking where:   no

medical assessment of claimant=s residual functional capacity, and claimant's testimony was

inconsistent with ALJ's assessment); *Butler v. Barnhart*, Case Number 03-31052 (5th Cir.

06/02/2004) (unpubl.) (in the absence of medical opinion or evidence establishing that the

claimant could perform the requisite exertional demands, the ALJ's determination is not

supported by substantial evidence).

## II.      Step Five and Remand

Because the foundation for the ALJ's step five determination was premised upon an RFC

that is not supported by substantial evidence, the court further finds that the Commissioner's

ultimate conclusion that Plaintiff is not disabled, likewise is not supported by substantial

evidence.[6]

The courts enjoy the authority to enter, upon the pleadings and transcript of the record, a

judgment affirming, modifying, or reversing the decision of the Commissioner of Social

_____

[6] Having determined that remand is required because the ALJ's physical residual functional
assessment is not supported by substantial evidence, the court need not consider Plaintiff's
additional argument directed at the ALJ's mental RFC.   Upon remand, Plaintiff may urge the
ALJ to adopt the limitations recognized by Dr. Hill.   Alternatively, another consultative mental
examination may be obtained, if necessary.

Security, with or without remanding the cause for a rehearing.   42 U.S.C. § 405(g).   When reversal is warranted, the matter is remanded with instructions to make an award only if the record enables the court to conclusively determine that the claimant is entitled to benefits.   *See Ferguson v. Heckler*, 750 F.2d 503, 505 (5th Cir. 1985); *see also Rini v. Harris*, 615 F.2d 625, 627 (5th Cir. 1980) (reversing and remanding with direction to enter judgment where the evidence was not substantial and the record clearly showed the claimant's right to benefits). The instant record is not so disposed.   Plaintiff=s residual functional capacity assessment remains indeterminate.

## Conclusion

For the foregoing reasons,

IT IS RECOMMENDED that the Commissioner's decision be REVERSED and REMANDED pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further proceedings consistent herewith.

Under the provisions of 28 U.S.C.§ 636(b)(1)(C) and FRCP Rule 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.   A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof.   A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing.   Timely objections will be considered by the District Judge before a final ruling issues.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE**

**SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

In Chambers, at Monroe, Louisiana, on this 1st day of October, 2021.

KAYLA DYE MCCLUSKY
UNITED STATES MAGISTRATE JUDGE

24